## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FREEDOM MEDICAL INC.,**<br>**Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **GERRY L. WHITMAN, et al.**<br>**Defendants.** | **NO.  18-4155** |

## <u>MEMORANDUM OPINION</u>

A long-simmering commercial dispute between two players in the medical equipment sales business has boiled over into the controversy presently before the Court.  Plaintiff, Freedom Medical Inc., is a Pennsylvania-based medical equipment sales company; Defendants are: Med One Equipment Services ("Med One"), a medical sales company; a family of corporations linked to Med One ("Corporate Affiliates"); and three individual ("Individual Defendants"), all of whom recently left the employ of Plaintiff to take new roles with Med One.  The dispute arises out of allegations that the Individual Defendants misappropriated Freedom Medical's confidential and proprietary information to solicit customers for Med One; and, that Med One facilitated the misappropriation by poaching Freedom Medical's employees.  On September 26, 2018, Freedom Medical filed both a Complaint and a Motion for a Temporary Restraining (TRO) and Preliminary Injunction.  On October 4, 2018, the Court granted in part and denied in part the TRO.  Specifically, the Court enjoined the Individual Defendants from divulging or using Freedom Medical's trade secrets, and ordered the Defendants to return any confidential or proprietary information to Freedom Medical.

Presently before the Court is Freedom Medical's Motion for Preliminary Injunction. Based upon the parties' submissions and testimony elicited at a hearing held on October 23 and 25, 2018, Plaintiff's motion will be granted in part and denied in part.

# I. Background

## A. Freedom Medical

Freedom Medical is in the business of renting and selling medical equipment to hospitals, nursing homes and other healthcare providers. Particularly important to Freedom Medical's business is the relationships it has with healthcare providers that are members of Group Purchasing Organizations ("GPO"), entities that aggregate purchasing volume among member-healthcare-providers and leverage that volume to negotiate discounts with manufacturers, distributors and other vendors. Freedom Medical is a "preferred provider" of medical equipment for three of the four largest GPOs in the nation. As a preferred provider, Freedom Medical may submit bids in response to a GPO's request for proposals; if the bids are accepted, then Freedom Medical signs an Agreement with the GPO, guaranteeing that Freedom Medical will provide goods and services to GPO members under the terms set forth in the Agreement. Such GPO Agreements contain pricing and servicing information.

To maintain an advantage in the competitive healthcare industry, Freedom Medical has developed certain information related to its business, which it contends is both confidential and proprietary, including, *inter alia*, pricing information, business plans and customer lists.[1] Freedom Medical takes several affirmative steps to safeguard this confidential information. First, Freedom Medical requires all employees to acknowledge and agree to comply with an Acceptable Use Policy that restricts the use of digitally stored confidential information. Second, Freedom Medical requires all employees with access to confidential information to sign

---

[1] Freedom Medical defines its confidential information to include "marketing strategies, contact lists, group purchasing organization relationships, supplier relationships and agreements, internal rates of return, product pricing, product costs, customer lists, customer preferences, customer patient demographics, product rental and sales information by customer, average rental terms, inventory by product and location, rental and sales revenue, variable costs, specialized training and servicing methodologies and knowhow associated with the proprietary products and services offered by the company."

restrictive covenants at the inception of their employment.  The restrictive covenants prohibit unauthorized use or disclosure of confidential information.  Furthermore, the restrictive covenants contain a global non-compete clause that prohibit employees from working for any competitor for a one-year period following the end of employment with Freedom Medical.[2]

### B.  Defendants

Plaintiff brings suit against two sets of Defendants.  The first group of Defendants consists of Med One, a Utah-based seller of medical equipment, and various corporate entities tied to Med One.[3]  Like Freedom Medical, Med One is in the business of selling and renting medical equipment to hospitals and other healthcare providers.  Although not a preferred provider for GPOs, Med One nevertheless sells and rents medical equipment to healthcare providers that are members of GPOs.[4]

The second group of Defendants consists of three former employees of Freedom Medical who left to take roles at Med One, namely Gerry Whitman, Joshua Oderlin, and Jason Cavanaugh ("Individual Defendants").  All three Individual Defendants worked as regional branch managers at Freedom Medical before leaving to join Med One: Whitman served as regional branch manager of the Atlanta Branch Office; Oderlin served as regional branch manager of the San Diego Branch Office; and Cavanaugh served as regional branch manager of the San Francisco Branch Office.   As regional branch managers, Individual Defendants had

---

[2] The employment contracts contain a choice-of-law clause providing that Pennsylvania law shall apply.

[3] The Corporate Affiliates are: Med One Equipment Rental-California, L.P.; Med One Equipment Rental-Georgia, L.P.; Med One Equipment Rental – Pennsylvania; L.P Med One Capital Funding - California, L.P.; Med One Capital Funding - Georgia, L.P.; and Med One Capital Funding - Pennsylvania, L.P.

[4] Membership in a GPO does not preclude a healthcare provider from seeking one-off deals with vendors like Med One.

access to Freedom Medical's confidential information, including customer lists, pricing schedules, and Freedom Medical's business plans.

Defendant Cavanaugh was the first to leave Freedom Medical, resigning on February 12, 2018. On April 3, 2018, Defendant Whitman left, and, finally, on July 6, 2018, Defendant Oderlin resigned. All three were hired to be sales representatives for Med One. Both Defendant Cavanaugh and Defendant Oderlin remained in their respective territories. Defendant Whitman, however, moved territories, switching to the Florida Panhandle.

As of October 24, 2018, Defendant Cavanaugh was no longer employed at Med One. Defendant Oderlin, while still employed, was on unpaid leave pending an investigation related to this case. Defendant Whitman remains employed at Med One.

### C. Procedural History

On September 26, 2018, Freedom Medical filed suit against Defendants, bringing the following claims: (1) Violation of the Defend Trade Secret Act (DTSA), 18 U.S.C. § 1836, against all Defendants; (2) Misappropriation of Trade Secrets and Confidential Information in violation of the Pennsylvania Uniform Trade Secrets Act (PUTSA), 12 Pa. C.S.A. § 5301, against all Defendants; (3) Breach of Contract against Defendants Cavanaugh, Whitman, and Oderlin; (4) Tortious Interference with Contractual Relations against Med One; and (5) Breach of Fiduciary Duty against Defendants Cavanaugh, Whitman, and Oderlin. Plaintiff petitioned for various forms of injunctive relief, including asking the Court to:

- Enjoin, temporarily, preliminarily and permanently thereafter, Cavanaugh, Whitman and Oderlin from directly or indirectly using, disclosing or retaining any confidential, proprietary or trade secret information of Freedom Medical;

- Enjoin, temporarily, preliminarily and permanently thereafter Cavanaugh, Whitman and Oderlin from soliciting, doing business with, selling to, renting to or servicing any current or prospective client, customer or account, who has been solicited or serviced by

Freedom Medical or any affiliate of Freedom Medical within one (1) year prior to the termination of their employment;

- Enjoin, temporarily, preliminarily and permanently thereafter for a one (1) year period following a final order of this Court Cavanaugh, Whitman and Oderlin from working for any of the Med One Defendants, or any of their affiliated entities or any other person whether as an employee, consultant, owner, agent, or in any other capacity or manner whatsoever, for their own account or for the benefit of any person, that is engaged in any business or any service that, directly or indirectly, is in competition with, similar to or the same as the business of Freedom Medical;

- Enjoin, temporarily, preliminarily and permanently thereafter Cavanaugh, Whitman and Oderlin from soliciting any employee of Freedom Medical to leave his or her employment with Freedom Medical;

- Enjoining the Med One Defendants and each of their affiliated entities from continuing to employ Cavanaugh, Whitman and Oderlin in violation of the restrictive covenants contained in their employment agreements;

- Order Cavanaugh, Whitman and Oderlin to return to Freedom Medical all Freedom Medical confidential, proprietary or trade secret information and produce for inspection and analysis all their personal computers, smart phones, thumb drives and any other digital media storage devices;

- Order Cavanaugh, Whitman and Oderlin to provide Freedom Medical with a full, detailed and complete accounting of all communications each of them has had with current or prospective customers of Freedom Medical or any employee of Freedom Medical since the end of their employment with Freedom Medical;

- Order Cavanaugh, Whitman and Oderlin to provide a detailed accounting of all revenues attributable directly or indirectly to the activities of Cavanaugh, Whitman and Oderlin since they became employed by Med One.

On October 4, 2018, following a hearing, the Court granted in part and denied in part Freedom Medical's TRO. Specifically, the Court enjoined the Individual Defendants "from divulging to Defendant Med One or any other person, company, or entity or using for any purpose any trade secrets, proprietary information, or confidential information belonging to Plaintiff," and further ordered the Individual Defendants to "immediately return to Plaintiff any . . . confidential or proprietary information of Plaintiff that is in their possession or control, in whatever form that information exists, including, but not limited to any physical or electronic

documents and copies thereof, with the exception of documents and information pertaining to Defendants Whitman, Oderlin and Cavanaugh's personal compensation."[5]

The Court held hearings on Freedom Medical's motion on October 23 and October 25, 2018. At the hearings, the parties elicited testimony from the following witnesses: Michael Boylan, Chief Executive Officer for Freedom Medical; Jim Acker, Senior Vice President (SVP) for Freedom Medical; Phil Henry, SVP for Freedom Medical; Eric Wenzel, Chief Financial and Operations Officer for Freedom Medical; Brad Johnson, Regional Manager for Med One; Defendant Whitman; and, Defendant Oderlin.

## II.      Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The "failure to establish any element . . . renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). The movant bears the burden of showing that these four factors weigh in favor of granting the injunction. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).

## III.      Discussion

Freedom Medical moves for preliminary injunctive relief across a broad front, seeking to enjoin all Defendants for misappropriating trade secrets, enjoin the Individual Defendants for

---

[5] On October 15, 2018, Freedom Medical also moved for an Order to Show Cause, alleging that Defendant Whitman violated the TRO by failing to return four Excel spreadsheets that he had emailed to himself on the eve of resigning. However, Freedom Medical withdrew that motion in order to submit a broader motion based on the discovery of additional evidence of non-compliance leading up to the October 23, 2018 hearing. Therefore, there is presently no motion to show cause pending before the Court.

breach of contract and breach of a fiduciary duty, and enjoin Med One for tortious interference with contractual relations.

### A.  Misappropriation of Trade Secrets

Freedom Medical claims that all of the Defendants—Med One, the Corporate Affiliates, and each of the Individual Defendants—misappropriated its trade secrets in violation of both the DTSA and PUTSA.  Accordingly, it seeks to enjoin all of the Defendants for the alleged misappropriation.  The evidence, however, differs as to each of the Defendants—different Defendants are alleged to have taken different information.  Therefore, an individualized determination is necessary as to whether Freedom Medical carried its burden of showing an injunction should issue.  *Certainteed Ceilings Corp. v. Aiken*, 2015 WL 410029, at *4 (E.D. Pa. Jan. 29, 2015) ("Determining whether particular information is a trade secret is a fact- and context-specific process.").

### 1.  Defendant Whitman

Freedom Medical claims that Defendant Whitman misappropriated its trade secrets, when on April 2nd, 2018—the day before he left Freedom Medical—he sent himself an email, attaching four Excel spreadsheets that contained Freedom Medical's price schedules.  There is no evidence that Defendant Whitman took or used any other information that Freedom Medical considered trade secrets.  Thus, the question is whether the email and the four attachments are sufficient to support an injunction against Defendant Whitman.

#### i.  *Likelihood of Success on Merits*

To be entitled to an injunction against use or disclosure of confidential information, Freedom Medical must show:

> (1) that the information constitutes a trade secret; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of

discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.

*SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985) (citing *Felmlee v. Lockett*, 351 A.2d 273, 277 (Pa. 1976)).[6]

### a. Trade Secret

The first question is whether the spreadsheets containing Freedom Medical's pricing information constitutes a trade secret. "Although the DTSA and the PUTSA use different wording to define a trade secret, they essentially protect the same type of information." *Teva Pharm. USA, Inc. v. Sandhu*, 291 F.Supp.3d 659, 675 (E.D. Pa. 2018). That is, both define a protected trade secret as information that: "(a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use." *Id.* (citing 18 U.S.C. § 1839(3); 12 Pa. Stat. § 5302).

Here, Freedom Medical has taken reasonable steps to keep its price schedules secret. In its Acceptable Use Policy, Freedom Medical defines pricing information as the company's confidential information and restricts the disclosure of such information. Further, Freedom Medical's employment agreements contain restrictive covenants that prohibit employees from taking or using confidential information, including price schedules, once they leave Freedom Medical.

---

[6] Although Freedom Medical brought separate claims for misappropriation of trade secrets under the DTSA and PUTSA, the analysis as to the likelihood of success is the same because the DTSA and PUTSA effectively proscribe the same conduct. *See, e.g.*, *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *8 (N.D. Ill. Sept. 8, 2017); *CF Veronica Foods Co. v. Ecklin*, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) (collecting cases from California, Nevada, and Oregon).

Second, Freedom Medical also derives independent economic value from having its pricing schedules kept secret. Boylan testified that the pricing schedules are based on Freedom Medical's understanding of the healthcare-equipment market and the company's own economics. As Henry explained, the pricing schedules are valuable because they are the baseline from which Freedom Medical negotiates with healthcare providers to sell and rent medical equipment. Widespread-publication of the pricing schedules would allow competitors to undercut Freedom Medical's bids to GPO members and other healthcare equipment purchasers.

Relatedly, having access to Freedom Medical's price schedules would be of value to Med One because that information could be used to undercut Freedom Medical's offers to healthcare providers, and allow Med One to steal sales. Although Johnson testified that the prices charged by Freedom Medical were not relevant to Med One's pricing model, it is not credible to suggest that having a potential competitor's pricing would not be of some value for Med One. After all, as Wenzel testified, healthcare providers seeking to obtain movable medical equipment— whether by renting it or purchasing it—are price sensitive because the products are, in effect, fungible. Thus, knowing another provider's price would allow Med One to consistently undercut Freedom Medical's offer.

Whether price schedules are protected trade secrets, then, turns on if the pricing schedules were "readily ascertainable by proper means." *Teva Pharm*, 291 F.Supp.3d at 675. Generally, pure pricing information is not protectable because that information is known to the customer, "who has every right to disclose this information, if it so chooses, to inquiring competitors of the plaintiff." *Tyson Metal Prod., Inc. v. McCann*, 546 A.2d 119, 122 (Pa. Super. 1988). The Third Circuit, however, has distinguished between pure pricing information, readily obtainable from other sources, and proprietary pricing formulae derived from a "range of data

relat[ed] to materials, labor, overhead, and profit margin," which is entitled to protection as a trade secret. *SI Handling*, 753 F.2d at 1260. Moreover, courts have afforded greater protection to "the *compilation* of [pricing] information—its aggregation and organization into the spreadsheets" where "the compilation of information is not readily obtainable from publicly available sources." *Amerisourcebergen Drug Corp. v. Am. Associated Druggists, Inc.*, 2008 WL 248933, at *25 (E.D. Pa. Jan. 29, 2008); *see also Nat'l. Risk Mgmt., Inc. v. Bramwell,* 819 F.Supp. 417, 430–31 (E.D.Pa. 1993) (holding that customer information, such as costing and price information, compiled by a business represents a material investment of time and money and constitutes a valuable asset).

Here, the pricing schedules are more than "pure pricing information" because they are the product of a proprietary pricing formulae derived from a "range of data relat[ed] to materials, labor, overhead, and profit margin." *SI Handling*, 753 F.2d at 1260. Wenzel testified that the pricing schedules are the product of Freedom Medical's proprietary financial model. Freedom Medical factors in the cost of equipment, cost of overhead, and depreciation costs to set monthly cash-on-cash return targets (return in months or RIMs) for each of its products. Freedom Medical's finance team then works with sales teams to adjust prices based on what market conditions will bear. The adjusted prices and RIMs are then then used in Freedom Medical's capital budgeting process. More than "pure price information," the price schedules are instead the product of a comprehensive budgeting process. As such, the pricing schedules are protected trade secrets.

In addition, the compilation of Freedom Medical's pricing information into aggregated and organized pricing schedules renders the information protected trade secrets. Although Freedom Medical's customers—and thus, also its competitors—can access Freedom Medical's

price information for a given product, the full compilation of pricing information is not readily

obtainable from publicly available sources.  As Henry testified, Freedom Medical's sales

representatives would not include a full price list in a bid; rather, reps would include only the

pricing information for the products relevant to the bid.  And while any GPO member may

access Freedom Medical's pricing information through an online portal, Wenzel testified that

members do not have access to the compiled pricing information organized into readily

accessible spreadsheets.  Thus, the compilation of Freedom Medical's pricing information into

organized schedules further supports the conclusion that the schedules are protected trade

secrets.

### b.   Value to the Employer

The second question is whether the price schedules "[were] of value to [Freedom

Medical] and important in the conduct of [its] business." *Id.* at 1255.   This inquiry is largely

redundant with the inquiry into whether the price schedules are a protected trade secret.  As

noted, Freedom Medical's price schedules are critical to its business because they are the

baseline from which Freedom Medical negotiates with healthcare providers to sell and rent

medical equipment.  The price schedules ensure that Freedom Medical remains profitable in its

rental and sales business, and are therefore valuable to Freedom Medical.

### c.   Right to Use and Enjoyment

The third question is whether "by reason of discovery or ownership [Freedom Medical]

had the right to the use and enjoyment of the secret." *Id.*  The pricing schedules are produced

and owned by Freedom Medical.  As Wenzel testified, all the pricing schedules were generated

by Freedom Medical for the company's use.  Thus, Freedom Medical had the right to the use and

enjoyment of the secret.

### d. Misappropriation

The final question is whether "the secret was communicated to [Defendant Whitman] while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer." *Id.*. "Under Pennsylvania law, the duty of an employee not to disclose the secrets of his employer may arise either from an express contract, or may be implied from the confidential relationship existing between the employer and employee." *BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.*, 791 F. Supp. 489, 548 (E.D. Pa. 1992). Here, Defendant Whitman's contract prohibited post-employment disclosure of trade secrets, and thus he had a contractual duty not to disclose the trade secrets of Freedom Medical. The issue, then, turns on whether the email Defendant Whitman sent to himself constituted misappropriation of Freedom Medical's trade secrets.

"A court may enjoin the actual or threatened misappropriation of a trade secret." *Bimbo Bakeries*, 613 F.3d at 110. Here, Freedom Medical has not carried its burden to show that Defendant Whitman actually misappropriated its trade secret. The only evidence offered by Freedom Medical of appropriation was the email Defendant Whitman sent to himself on the eve of his resignation. Freedom Medical argues that the timing of the email is evidence that Defendant Whitman intended to use the pricing information in his role with Med One. And indeed, Defendant Whitman had received an offer from Med One before he officially left Freedom Medical's employment.

Defendant Whitman, however, testified that he sent the email only so that he could wrap-up client work for Freedom Medical. Specifically, he explained that he used the pricing schedules to complete client work to ease the burden on his successor. He further stated that he

deleted the email from his personal account within twenty-four hours—that is, before his employment with Freedom Medical officially came to an end. Finally, Defendant Whitman testified that in his current role with Med One, he has no need for the pricing schedules. Although the timing of the email is suspicious, the Court finds Defendant Whitman's testimony credible, and concludes that Freedom Medical has not carried its burden of showing actual misappropriation.

Where there is no actual misappropriation of trade secrets, "courts applying Pennsylvania law" are nevertheless "empowered to enjoin . . . the threatened misappropriation of trade secrets." *Id.* at 112. When disclosure is merely threatened, the Pennsylvania courts have employed the "inevitable disclosure" doctrine, which provides that an injunction may issue so long as "defendant's new employment 'is likely to result in the disclosure' of a former employer's trade secrets." *Id.* (quoting *Air Prod. & Chemicals, Inc. v. Johnson*, 442 A.2d 1114, 1120 (Pa. Super. 1982)). While it is a closer call, the Court again concludes that Freedom Medical has not carried its burden of showing that Defendant Whitman's employment with Med One "is likely to result" in misappropriation. *Id.* As noted, Defendant Whitman testified that he deleted the email containing the pricing schedules over six months ago. Moreover, while knowing Freedom Medical's pricing schedule would likely benefit Med One's business generally, the Court finds credible Defendant Whitman's testimony that *he* has no need for the pricing schedules in his new role, especially because, as Johnson testified, a sales representative—like Defendant Whitman—does not have the power to adjust Med One's prices.[7]

In sum, Freedom Medical has failed to show that it is likely to succeed on the merits of its claim for misappropriation of trade secrets against Defendant Whitman because Freedom

---

[7] Without the actual schedules, it is also unlikely that Defendant Whitman could make use of the information contained therein because the spreadsheets have pricing information for hundreds of products, which would be difficult to memorize and recall.

Medical has failed to establish actual or threatened misappropriation.  Therefore, no injunction will issue again Defendant Whitman on the misappropriation claim.

### 2.  Defendant Cavanaugh

Freedom Medical claims that Defendant Cavanaugh misappropriated trade secrets—including GPO pricing schedules and Freedom Medical's 2017 business plan for the Southern California region—by sharing that information with Med One employees.

### i.  *Likelihood of Success on Merits*

Freedom Medical has put forth sufficient evidence to support a conclusion that it is likely to succeed on the merits of its claim against Defendant Cavanaugh.

First, for the reasons discussed above, Freedom Medical's pricing information is a protected trade secret.  In addition, Freedom Medical's regional business plan is also a protected trade secret.  *See BIEC Int'l*, 791 F. Supp. at 546 (finding plaintiff's business plans enjoyed trade secret protection); *Air Prod.*, 442 A.2d at 418-20 (same).  Freedom Medical took reasonable steps to keep its business plan secret.  Wenzel testified that business plans are covered by Freedom Medical's Acceptable Use Policy, and that business plans are not shared outside the company.  Further, Freedom Medical derives economic value from business plans being kept secret, as such plans identify current customers, identify prospect customers, set forth actions plans on how to move non-customers to customers, and include general strategy for the upcoming year.  Boylan testified that, if Freedom Medical's business plans were disclosed to its competitors, then Freedom Medical's business would be threatened because competitors could take preemptive steps to foil Freedom Medical's objectives.  Freedom Medical's business plans are also not readily ascertainable because, as Wenzel testified, they are not shared outside the company.  Finally, as noted, if business plans were disclosed to Freedom Medical's competitors,

those competitors could obtain economic value from that disclosure by crafting strategies to counteract Freedom Medical's objectives.

Second, Freedom Medical's business plans and price schedules are important to its commercial success. Boylan testified that Freedom Medical's business plans are the roadmap for the company's financial success, and the pricing schedule, as the basis from which its sales teams negotiate with customers, are the tools its employees use to execute on that plan.

Third, Freedom Medical enjoys the right to use its business plans and price schedules because both are fully produced and owned by the company.

Fourth, and finally, Freedom Medical introduced evidence that Defendant Cavanaugh actually misappropriated its trade secrets. Defendant Cavanaugh, like Defendant Whitman, had a contractual duty not to disclose the secrets of Freedom Medical. *BIEC Int'l*, 791 F. Supp. at 548. Nevertheless, Freedom Medical produced emails showing Defendant Cavanaugh did just that. First, Freedom Medical introduced an email Defendant Cavanaugh sent from his Freedom Medical email address to his personal email address that had pricing information and business plans attached. In addition, Freedom Medical produced emails Defendant Cavanaugh sent as a Med One employee to other Med One sales representatives that included Freedom Medical's pricing schedule and business plans. In one such email, Defendant Cavanaugh attached a copy of Freedom Medical's business plan and stated: "Attached is the So Cal report for 2017 it will give you an idea of whats going on in your territory on Freedoms side." In another, Defendant Cavanaugh sent a Med One co-worker a copy of Freedom Medical's pricing schedule and then compared Freedom Medical's prices to those offered by Med One: "Below is the pricing for Med-One compared to Freedom. . . . I also attached Freedom's pricing." Finally, the emails suggest that Defendant Cavanaugh may have used the information to try to poach Freedom

Medical customers. In the email comparing prices, Defendant Cavanaugh says, "I was able to get all the numbers together for the UC Davis Proposal," which was a customer of Defendant Cavanaugh during his time at Freedom Medical. Thus, Freedom Medical is likely to succeed on its misappropriation claims against Defendant Cavanaugh.

ii. *Irreparable Harm*

For an injunction to issue, Freedom Medical must also establish that it stands to suffer immediate irreparable harm, absent the issuance of preliminary relief. In the context of trade secrets, the Third Circuit has stated that "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3d Cir. 1992). However, irreparable harm will not be presumed merely because the elements of a trade secret claim have been satisfied. *Id.* Instead, a party seeking a preliminary injunction must make "a clear showing of immediate irreparable injury." Thus, in a misappropriation claim, while "[a] threat of disclosure may establish immediate irreparable harm," "further disclosure of something already revealed cannot." *Id.*

Freedom Medical has failed to carry its burden of showing that Defendant Cavanaugh has "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor." *Id.* Although the evidence shows that he misappropriated Freedom Medical's trade secrets while working for Med One, Defendant Cavanaugh is no longer employed for Med One. Defendant Cavanaugh's past misappropriation is insufficient, without more, to support the issuance of a preliminary injunction. *See Continental Group, Inc. v. Amoco Chems. Corp.,* 614 F.2d 351, 359 (3d Cir.1980) ("Injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued to

restrain one from doing what he is not attempting and does not intend to do.") (internal quotation marks omitted). Freedom Medical produced no evidence to establish that it is likely to suffer immediate irreparable harm from Defendant Cavanaugh's future misappropriation of trade secrets. Thus, no preliminary injunction will issue against Defendant Cavanaugh on the misappropriation of trade secret claim.

### 3. Defendant Oderlin

The story is different as to Defendant Oderlin. Freedom Medical produced evidence that Defendant Oderlin misappropriated its trade secrets, specifically by sharing Freedom Medical's pricing schedules with employees at Med One.[8]

#### i. *Likelihood of Success on Merits*

As discussed at some length above, Freedom Medical's pricing schedule "constitutes a trade secret," "was of value to [Freedom Medical] and important in the conduct of [its] business," and "by reason of discovery or ownership [Freedom Medical] had the right to the use and enjoyment of the secret." *SI Handling Sys.*, 753 F.2d at 1255. Furthermore, Defendant Oderlin had a contractual duty not to disclose the secrets of Freedom Medical. *BIEC Int'l*, 791 F. Supp. at 548.

In addition, Freedom Medical established that Defendant Oderlin actually misappropriated its trade secrets by sharing Freedom Medical's pricing information with Med One employees. In one email, Defendant Oderlin sent another Med One employee a copy of Freedom Medical's agreement with a GPO that included, as an attachment, a price schedule for

---

[8] Freedom Medical also argues that Defendant Oderlin misappropriated customer lists by sending himself an email that included the contact information from his Freedom Medical Microsoft Outlook Contacts. Freedom Medical, however, has failed to show that the contact list was a protected trade secret. Defendant Oderlin testified that upwards of "75%" of the contact information concerned his personal contacts that were unrelated to Freedom Medical. Further, Wenzel testified that Freedom Medical kept its customer information in a separate database called Zoho that was not integrated with Outlook. It is far from clear, then, that the contact list is information that Freedom Medical "derives independent economic value, actual or potential, from being kept secret." *Teva Pharm.*, 291 F.Supp.3d at 675.

all of Freedom Medical's equipment. Another email, with the subject line "Competitive Pricing," shows Defendant Oderlin telling another Med One sales representative that: "Freedom is currently charging the rates below on the [GPO]," followed by a table of prices for Freedom Medical's prices. The table corresponds exactly to a Freedom Medical GPO pricing schedule that Defendant Cavanaugh had in his possession as of September 20, 2018. While Defendant Oderlin testified that he did not use Freedom Medical's price schedule and, instead, recalled those price figures from memory, such testimony is not credible. Thus, Freedom Medical has demonstrated it is likely to succeed on the merits of its misappropriation claim against Defendant Oderlin.

### ii. *Irreparable Harm*

The evidence introduced by Freedom Medical demonstrates that Defendant Oderlin has "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor." *Campbell Soup,* 977 F.2d at 92. Defendant Oderlin remains employed by Med One as a sales representative. Unlike Defendant Cavanaugh, Defendant Oderlin remains in a position to take advantage of Freedom Medical's trade secret. Thus, Freedom Medical has carried its burden of showing that it stands to suffer immediate irreparable harm from Defendant Oderlin's actual or threatened misappropriation of its trade secrets.

### iii. *Balance of Equities*

Balancing of the equities requires evaluating whether the harm done to Freedom Medical through the misappropriation of its trade secrets outweighs the potential harm done to Defendant Oderlin through the issuance of a preliminary injunction. *See, e.g.*, *Bimbo Bakeries*, 613 F.3d at 118-19. As noted, Freedom Medical stands to suffer irreparable harm in the absence of an injunction. While Defendant Oderlin will suffer no harm if enjoined from using trade secrets that

he has no legal authority to use, "even a temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses operates as a severe restriction on him that a court should not impose lightly." *Id.* at 119. The Court, however, "may fashion a trade secret injunction that is broad enough to ensure that the information is protected." *SI Handling Sys.*, 753 F.2d at 1265. Thus, the equities tilt toward the issuance of an injunction short of "a temporary restriction on [] employment." *Bimbo Bakeries*, 613 F.3d at 119.

<em>iv.    Public Interest</em>

Finally, Freedom Medical must show that the public interest weighs in favor of issuing an injunction. In a misappropriation of trade secrets case, "there are several public interests at play." *Id.* "[T]here is a generalized public interest in upholding the inviolability of trade secrets and enforcing of confidentiality agreements." *Id.* (internal quotation marks omitted). At the same time, "there is a public interest in employers being free to hire whom they please and in employees being free to work for whom they please." *Id*. In balancing these interest, "Pennsylvania courts consider the right of the employee to be the more significant." *Id.* (citing *Wexler v. Greenberg*, 160 A.2d 430, 434-35 (Pa. 1960)). Nevertheless, "extensive precedent supports an injunctive remedy where"—as here—" the elements of a trade secret claim are established" and injunctive relief is necessary to protect the holder of the trade secret. *SI Handling Sys.*, 753 F.2d at 1265; *see also Bimbo Bakeries*, 613 F.3d at 119 (upholding the issuance of a preliminary injunction). Thus, an injunction will issue against Defendant Oderlin on the misappropriation claim.

### 4. Med One

Freedom Medical also seeks to enjoin Med One. The basis of Freedom Medical's argument is that Med One acquired Freedom Medical's trade secrets and "kn[ew] or ha[d] reason

to know that the trade secret [s] was acquired by improper means." 18 U.S.C. § 1839(5)(A); *see also* 12 Pa.C.S.A. § 5302 (same). Under Pennsylvania law, an employer that acquires a competitor's trade secrets may be held liable if it knew or should have known that the trade secret was acquired by improper means. *PNC Mortg. v. Superior Mortg. Corp.*, 2012 WL 628000, at *25 (E.D. Pa. Feb. 27, 2012). And, while at least one federal court has held an employer may be held vicariously liable for misappropriation, *see Advanced Fluid Sys., Inc. v. Huber*, 295 F.Supp.3d 467, 486 (M.D. Pa. 2018), neither the Third Circuit nor the Pennsylvania Supreme Court have definitively addressed the issue. *Id.* ("No court has yet addressed whether PUTSA allows for vicarious trade secret liability.").

Here, the evidence is sparse as to what, if anything, Med One knew about the misappropriation of Freedom Medical's trade secrets. Freedom Medical introduced emails in which Defendants Cavanaugh and Oderlin shared Freedom Medical information with Med One sales representatives. The evidence suggests that those representatives likely should have known that the information shared—specifically, Freedom Medical's business plan and contract with Tri-City Medical Center—was, at the very least, confidential.

Despite that, it is far from clear that Freedom Medical would likely prevail in a misappropriation claim against Med One. First, no evidence was produced showing that Med One knew or should have known that Defendants Oderlin or Cavanaugh misappropriated trade secrets when they were hired. Second, although some Med One employees had access to this information, Johnson, who managed the sales representatives, testified that he was not aware of that fact. Third, Boylan testified that Freedom Medical had access to competitor's GPO pricing information, which suggests possession of such information was not necessarily uncommon in the industry. The record is insufficient for the Court to draw a firm conclusion as to whether it

was common practice, rather than an indication of misappropriation, to share information like that shared here. And, even if the Med One representatives who received this information had constructive knowledge that it was acquired through improper means, the parties have not briefed whether Med One may be held vicariously liable for those actions. *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa.Super.1979) (laying out standard for holding company vicariously liable for its employees). Absent such briefing, the Court will refrain from deciding on the issue.

The parties' briefing, or lack thereof, and the sparse factual record developed is insufficient to support a conclusion that Freedom Medical is "likely to succeed on the merits" on its misappropriation claims against Med One. *Winter*, 555 U.S. at 20. Moreover, Freedom Medical has not shown that the balance of the equities or the public interest weigh in favor of issuing a preliminary injunction. Thus, no such preliminary injunction will issue against Med One.[9]

### 5. Med One Corporate Affiliates

For the same reasons no preliminary injunction will issue against Med One, none will issue against the Corporate Affiliates either.

### B. Breach of Contract

Freedom Medical also seeks to enjoin Individual Defendants from continuing their employment with Med One on the grounds that the Individual Defendants breached the restrictive covenants contained in their Freedom Medical employment contracts.

---

[9] Of course, the denial of a preliminary injunction does not preclude Freedom Medical from pursuing a claim against Med One once a fuller record is developed.

### 1. Likelihood of Success on Merits

To prevail on its breach of contract claim, Freedom Medical must establish (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).[10] Here, there is no dispute that by taking employment with Med One, another purveyor of medical equipment, the Individual Defendants did not abide by the express terms of the agreement. Nevertheless, Defendants advance two arguments as to why those restrictive covenants are unenforceable. First, Defendants Cavanaugh and Oderlin argue that, although the employment contracts have a choice-of-law clause requiring the application of Pennsylvania law, California law governs their employment contracts and California law prohibits restrictive covenants.[11] *See Whyte v. Schlage Lock Co.,* 125 Cal.Rptr.2d 277, 292 (Cal. Ct. App 2002) (noting California law "generally prohibits covenants not to compete, and California public policy strongly favors employee mobility."). Second, all of the Individual Defendants argue that, even if Pennsylvania law applies, the restrictive covenants were unreasonable because they lacked a geographic limitation.

### i.    *Choice of Law*

The Court must first determine what law applies to the Individual Defendants' employment contracts. A federal court sitting in diversity must apply the choice-of-law-rules of the forum state—here, Pennsylvania. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007). Under Pennsylvania choice-of-law rules, "the first question to be answered in addressing a potential conflict of laws dispute is whether the parties explicitly or implicitly have chosen the relevant law." *Assicurazioni Generali, S.P.A. v. Clover,* 195 F.3d 161, 164 (3d Cir.1999).

---

[10] Wenzel testified that, as to the restrictive covenants, all three employment contracts were, in effect, identical.

[11] Defendant Whitman does not make a similar argument as to Georgia law.

Generally, if the parties have agreed to the applicable law, that agreed-upon law shall be given effect. *Id.* A choice-of-law clause may be invalidated, however, if "(1) the chosen state has no substantial relationship to the parties or the transaction, or (2) if application of the law of the chosen state would be contrary to a policy of a state with a materially greater interest than the chosen state in the determination of the particular issue." *Kruzits v. Okuma Mach. Tool, Inc.,* 40 F.3d 52, 55 (3d Cir.1994).

Here, Pennsylvania has a substantial relationship to the parties because Freedom Medical is a Pennsylvania-based company. *Select Med. Corp. v. Hardaway*, 2006 WL 859741, at *3 (E.D. Pa. Mar. 24, 2006) ("That [a business] is incorporated and has its principal place of business in Pennsylvania is sufficient to establish a relationship with this forum"). And, regardless of whether Pennsylvania law would be contrary to the policy of California, Pennsylvania law applies because California does not have a materially greater interest than does Pennsylvania in the dispute. The only connection California has with the dispute is that two of its citizens—Defendants Oderlin and Cavanaugh—voluntarily entered into agreements with a Pennsylvania-based employer. California's "interest in the transactions of its citizens," however, does not materially outweigh Pennsylvania's interest in ensuring corporations based in the state have "uniformity in dealings with [its] locations through the country." *Id.*; *see also DePuy Synthes Sales, Inc. v. Edwards*, 23 F.Supp.3d 472, 483 (E.D. Pa. 2014) ("Although [plaintiff] may live, work, and have signed the . . . agreement in California, Pennsylvania has a substantial interest in enforcing agreements freely entered into by the parties and related to business conducted within Pennsylvania borders. . . . I cannot say that California's interest in this case is materially greater than that of Pennsylvania.") (internal quotation marks omitted). Thus, Pennsylvania law applies.

Even if Pennsylvania law applies, the Court must determine if the restrictive covenants are appropriate under Pennsylvania law. Although still disfavored, restrictive covenants are permitted under Pennsylvania, if: (1) they relate to a contract for employment; (2) are supported by adequate consideration; and (3) the application of the covenant is reasonably limited in both time and territory. *See Piercing Pagoda, Inc. v. Hoffner*, 351 A.2d 207, 210 (Pa. 1976). Nevertheless, restrictive covenants are closely scrutinized: "A court must make an in-depth inquiry before entering a preliminary injunction that may have an impact on a person's livelihood." *PharMethod, Inc. v. Caserta*, 382 F. App'x 214, 220 (3d Cir. 2010).

Here, the restrictive covenants were incident to an employment agreement between the parties. The covenants were also supported by adequate consideration because they were based on the "employment itself." *Barb-Lee Mobile Frame Co. v. Hoot*, 206 A.2d 59, 61 (Pa. 1965) ("Where the restrictive covenant is ancillary to a contract establishing an employment relationship, where none existed previously thereto, the employment constitutes consideration supporting that covenant, as well as all other terms of the employment contract."). Further, the temporal limitation on the covenant—one year—was objectively reasonable, as several courts applying Pennsylvania law have found. *See Nextgen Healthcare Info. Sys., Inc. v. Messier*, 2005 WL 3021095, at *13 (E.D. Pa. Nov. 10, 2005) ("One-year restrictive covenants are routinely enforced under Pennsylvania.").

The issue, then, is whether the covenants' lack of a territorial limitation renders them unreasonable. Court applying Pennsylvania law "have found broad geographic restrictions reasonable so long as they are roughly consonant with the scope of the employee's duties." *Victaulic Co. v. Tieman,* 499 F.3d 227, 237 (3d Cir. 2007), *as amended* (Nov. 20, 2007)

(calling a *per se* rule against broad geographic restricts "antiquated"). Nevertheless, in cases concerning sales-based employees responsible for a defined territory:

> An employer's interest in the customer relationships developed by an employee whose contact with customers occurred at the customer's premises extends no farther than the sales territory to which the employee was assigned. Thus, a restrictive covenant designed to protect this interest is valid only insofar as it is limited to that area.

*Boldt Mach. & Tools, Inc. v. Wallace*, 366 A.2d 902, 908 (Pa. 1976); *see also Certainteed Ceilings Corp*, 2014 WL 5461546, at *11 (limiting non-compete covenant to sales representative's territory); *Allied Orthopedic Assocs., Inc. v. Leonetti*, 2018 WL 4051801, at *8 (E.D. Pa. Aug. 24, 2018) (same). "An overbroad covenant may be enforced 'but only to the extent of the employee's sales territory.'" *Certainteed Ceilings Corp*, 2014 WL 5461546, at *11 (quoting *Boldt Mach.*, 366 A.2d at 908).

Here, though all three Individual Defendants were Branch Managers with Freedom Medical, the role was essentially a sales role. Moreover, each of the Individual Defendants were limited to a specific sales territory: Defendant Whitman in Georgia and parts of Alabama, namely Birmingham; Defendant Oderlin in San Diego; and, Defendant Cavanaugh in San Francisco. The restrictive covenants, however, contain no geographic limitation; the Individual Defendants are barred from working for any competitor anywhere in the nation, or, for that matter, the world. Such an expansive geographic reach is not "roughly consonant with the scope of the employee[s'] duties." *Victaulic Co.*, 499 F.3d at 237. Freedom Medical's interest in "the customer relationships developed by" the Individual Defendants "extends no farther than the sales territory to which the employee[s] w[ere] assigned." *Boldt Mach.*, 366 A.2d at 908. Thus, Freedom Medical has not shown a likelihood of success on its breach of contract claims against the Individual Defendants to the extent that the restrictive covenants seek to preclude the

Individual Defendants from working for Med One in a sales area beyond "which the [Individual Defendants]" were assigned. *Id.* Any preliminary relief on Freedom Medical's breach of contract claims will be limited accordingly.

i.      *Irreparable Harm*

Because Freedom Medical is likely to succeed on a limited breach of contract claim, the next question is whether Freedom Medical stands to suffer irreparable harm from the Individual Defendants' breach of the restrictive covenants. Under Pennsylvania law, "the threat of the unbridled continuation of the violation [of a restrictive covenant] and the resultant incalculable damage to the former employer's business" establishes irreparable harm. *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1167 (Pa. 1977); *see also Healthcare Servs. Grp., Inc. v. Fay*, 597 F. App'x 102, 104 (3d Cir. 2015).

Here, the irreparable harm Freedom Medical stands to suffer differs between the three Individual Defendants. First, Defendant Whitman no longer works in the Georgia or Alabama region. Instead, his work with Med One is limited to the Florida Panhandle, a region of the country where, according to Wenzel, Freedom Medical has no customers. Thus, Defendant Whitman's employment with Med One has not caused irreparable harm to Freedom Medical. As to Defendant Cavanaugh, he is no longer employed with Med One. Because Defendants Cavanaugh is not employed by a competitor, Freedom Medical does not stand to suffer irreparable harm from the breach of his restrictive covenant. Defendant Oderlin, on the other hand, remains employed as a sales representative in the same territory in which he worked for Freedom Medical. Freedom Medical stands to suffer irreparable harm from Defendants Oderlin's continued violation of the restrictive covenant. Thus, no preliminary injunction will issue against Defendants Whitman and Cavanaugh on the breach of contract claim.

*ii.     Balance of Equities*

To determine whether an injunction should issue against Defendant Oderlin, the Court must weigh his interests against that of Freedom Medical.  As noted, Freedom Medical has an interest in enforcing the terms of its employment agreement and protecting its business from harm that will result from the breach of that agreement.  Defendant Oderlin, though, has an interest in "pursuing his livelihood in the manner he chooses."  *Bimbo Bakeries*, 613 F.3d at 119.  On balance, however, the equities tilt toward the issuance of an injunction.   Defendant Oderlin took employment with Med One in the region in which he previously worked, and seemingly tried to poach Freedom Medical's customers in that region.  The equities, then, weigh in favor of an injunction "where, as here, the facts demonstrate that the restriction is necessary to prevent greater irreparable harm from befalling another party."  *Id.*[12]

*iii.     Public Interest*

As noted, "there is a public interest in employers being free to hire whom they please and in employees being free to work for whom they please."  *Bimbo Bakeries*, 613 F.3d at 119.  At the same time, "courts have not been reluctant to hold that the public has a greater interest in seeing the non-compete covenant enforced than in allowing the employee to work in the new job."  Q*uaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 481 (E.D. Pa. 2007).  Thus, to the degree that Defendant Oderlin breached the terms of his non-compete, public interest weighs in favor of issuing a preliminary injunction.

In sum, then, a preliminary injunction will be granted against Defendant Oderlin to enforce the terms of the restrictive covenant, limited to the sales areas in which he worked as Freedom Medical employee.  No preliminary injunction will be issued to enforce the terms of

---

[12] There is no need to evaluate Med One or the Corporate Affiliates interests because Freedom Medical limited its breach of contract claim to the Individual Defendants.

Defendant Whitman's restrictive covenant because he took active steps to avoid infringing upon that covenant. Finally, no preliminary injunction will issue on Freedom Medical's breach of contract claim against Defendant Cavanaugh because he is no longer employed, and thus no longer in breach of his restrictive covenant.

### C. Tortious Interference of Contract

Freedom Medical also seeks an injunction against Med One related to the latter's tortious interference with Freedom Medical's employment contracts with the Individual Defendants. Regardless of whether it is likely to prevail on the merits,[13] a preliminary injunction will not issue on Freedom Medical's tortious interference claim because there has been no showing that Freedom Medical stands to suffer "immediate irreparable harm," in the absence of preliminary relief. *Campbell Soup*, 977 F.2d at 91. "[W]hen other remedies such as money damages are adequate to compensate a plaintiff for past harm," a preliminary injunction is inappropriate. *Id.* Simply put, a showing of past harm, without more, is insufficient to justify the issuance of a preliminary injunction. *Ali v. FCI Allenwood*, 2017 WL 3008545, at *2 (M.D. Pa. July 14, 2017) ("A preliminary injunction cannot be issued based on past harm," but is instead intended "to prevent future irreparable harm.") (quoting *Fisher v. Goord*, 981 F.Supp. 140, 168 (W.D.N.Y. 1997)).

Here, Freedom Medical has not put forth any evidence that it stands to suffer "immediate irreparable harm" from Med One's tortious interference. To the degree that Med One interfered with Freedom Medical's contracts by recruiting the Individual Defendants away from Freedom Medical, such conduct occurred entirely in the past. Any harm that Freedom Medical suffered,

---

[13] To prevail on a tortious interference of contract claim, the Freedom Medical must establish: "(1) a contractual relation; (2) purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of any privilege or justification on the part of the defendant; and (4) damage resulting from defendant's conduct." *Gundlach v. Reinstein*, 924 F. Supp. 684, 693 (E.D. Pa. 1996), *aff'd,* 114 F.3d 1172 (3d Cir. 1997).

such as the Individual Defendants leaving its employment, has also already occurred. Freedom Medical has not put forth evidence that Med One is currently interfering, or immediately threatens to interfere, with Freedom Medical's employment contracts. Absent such a showing, no preliminary injunction will issue.

### 3. Breach of Fiduciary Duty

Finally, Freedom Medical seeks injunctive relief related to Individual Defendants' breach of their fiduciary duty to Freedom Medical. Pennsylvania law permits a limited cause of action for a breach of fiduciary duty to an employer as follows:

> Pennsylvania law permits an agent or employee to "make arrangements to compete," but prohibits him from using "confidential information peculiar to his employer's business and acquired therein." Within this framework, an employee may properly inform customers of his current employer that he is leaving the employer to work elsewhere in the field, or to start his own competing business. In contrast, an employee who, while still working for her employer, makes improper use of her employer's trade secrets or confidential information, usurps a business opportunity from the employer, or, in preparing to work for a rival business, solicits customers for such rival business, may be liable for a breach of the duty of loyalty.

*Bro–Tech Corp. v. Thermax, Inc.,* 651 F.Supp.2d 378, 414 (E.D.Pa.2009) (internal citations omitted). Again, though, Freedom Medical has failed to establish that it stands to suffer irreparable harm absent the issuance of an injunction because any harm Freedom Medical suffered occurred entirely in the past. All of the Individual Defendants have already left Freedom Medical's employment. There is no ongoing or threatened breach of a fiduciary duty. Therefore, no preliminary injunction will issue on Freedom Medical's breach of fiduciary duty claim.

***

In conclusion, the Court will grant Freedom Medical's motion for a preliminary injunction as to Defendant Oderlin on Freedom Medical's misappropriation of trade secrets

claim and breach of contract claims.  The Court will deny the remainder of Freedom Medical's motion.

An appropriate order follows.

BY THE COURT:

**/s/Wendy Beetlestone, J.**

**WENDY BEETLESTONE, J.**

**October 29, 2018**